HENRY B. BYORS & SONS, INC. *vs.* BOARD OF WATER COMMISSIONERS OF NORTHBOROUGH & others.

Middlesex. November 4, 5, 1970. — December 10, 1970.

Present: TAURO, C.J., SPALDING, KIRK, REARDON, & QUIRICO, JJ.

*Municipal Corporations*, Waterworks.    *Contract*, Building contract. *Architect*.    *Agency*, Agent's contract.    *Northborough*.    *Words*, "Permits and licenses," "Connected fees."

The board of water commissioners of the town of Northborough, which had accepted St. 1882, c. 192, G. L. c. 40, § 42G, and G. L. c. 41, § 69B, was authorized, before permitting a connection between a town water main and a housing project, to require payment of a "demand charge" voted by it and not shown to be unreasonable or discriminatory, the purpose of which was to secure payment of a portion of the cost of supplying water. [357, 359]

The contract of the general contractor for construction of a housing project in a town and the contract of the plumbing subcontractor therefor did not make any party other than the housing authority responsible for payment of a substantial "demand charge" imposed by the board of water commissioners before permitting a connection between a town water main and the project [360]; a conclusion that the subcontractor was responsible for the "demand charge" was not warranted by provisions of the contracts requiring the subcontractor to "obtain all necessary permits and licenses and pay all connected fees"; to "Install all work in strict accordance with all applicable codes and ordinances," including "the rules and regulations" of the town's water department; to assume responsibility for "all water main and water services shown" on a drawing "including street connection"; and to "handle" the housing authority's application to the water department for necessary new mains, the form of which called for payment of the "demand charge." [360–362]

The rules and regulations of the water department of a town, which general bidders and plumbing subbidders on a housing project were required to obtain before submitting bids, did not put the successful plumbing subbidder on notice that he was to pay a substantial "demand charge" of the board of water commissioners before a connection between a

water main and the project would be permitted; such rules and regulations, together with the form of the application by the housing authority for water service, indicated that the obligation to pay such charge was solely on the authority. [362]

In a dispute between the housing authority of a town and the general contractor and the plumbing subcontractor for a housing project as to who was responsible for payment of a substantial "demand charge" imposed by the town's board of water commissioners before permitting a connection between a town water main and the project, a decision of the architect on the project that the plumbing subcontractor was responsible for such payment exceeded the architect's authority under a provision of the general contract that he should decide "all disputes arising under this contract," and his decision was a nullity. [364]

BILL IN EQUITY filed in the Superior Court on June 4, 1969.

The suit was heard by *Leen,* J.

*David C. Hawkins* for the plaintiff.

*Stanley G. Walker* for the Board of Water Commissioners of Northborough.

*Edward O. Proctor* for Sarno Construction Co., Inc.

*Robert T. Gabriel,* for Northborough Housing Authority, submitted a brief.

TAURO, C.J. This is a bill in equity for a declaratory decree brought by the plaintiff, Henry B. Byors & Sons, Inc. (Byors), a plumbing subcontractor of the defendant Sarno Construction Co., Inc. (Sarno), the general contractor. Other defendants are the Northborough Housing Authority (the housing authority) and the board of water commissioners of the town of Northborough (the water commissioners). The bill seeks a declaration as to the validity of a "demand charge" imposed by the water commissioners as a condition precedent to providing water service to the building units owned by the housing authority and constructed by Sarno; and if it is valid, whether Byors is legally obligated to pay the demand charge under the terms of the subcontract with Sarno and the terms of the general contract between Sarno and the housing authority.

The case was heard in the Superior Court upon a statement of agreed facts together with certain exhibits. A final decree was entered to the effect that the demand charge was valid; that Byors was liable for the charge; that the

housing authority was justified in withholding payments from Sarno; and that Sarno was justified in withholding payments under its contract with Byors up to the amount of the charge. From this decree Byors appealed.

The facts are summarized: On or about July 17, 1968, Sarno and the housing authority entered into a general contract for the construction of a housing project for the elderly in Northborough. Byors and Sarno entered into a subcontract whereby for the sum of $99,000 Byors agreed to supply the labor and materials for the plumbing work on the project.

There was no item in the subbid of Byors or in the general bid of Sarno concerning the payment of a demand charge to the water commissioners as a condition precedent to providing water service to the project.

Byors requested permission of the water commissioners to connect the pipes of the project with the municipal water main. The water commissioners informed Byors that it could not bring water into the project from the municipal water main or make any connection for this purpose until a demand charge of $10,950 or $150 for each of the seventy-three units of the project was paid. The demand charge was voted by the water commissioners to pay a portion of the cost of supplying sufficient water at adequate pressure to meet the increasing demands for water by the cumulative effect of new household units being supplied with water.[1]

Byors at all times refused to pay the charge and informed

---

[1] Paragraph 24 of the statement of agreed facts states: "The demand charge referred to herein and in the pleadings and exhibits was voted by the Board of Water Commissioners to pay a portion of the cost of supplying sufficient water at adequate pressure to meet the increasing demands for water by the cumulative effect of new household units being supplied with water. To adequately serve five hundred new household units it is necessary to purchase a new well site, construct a well with pumping station, filtration equipment, appurtenances and attachments to the mains at a cost, based on prior expenditures, of between $75,000 and $100,000. To serve 1,000 new household units with sufficient pressure, it is necessary to locate and construct additional storage and pressure facilities at a cost, based on prior expenditures, of about $80,000. Other costs, which are the direct result of such added demands for water, are the replacement of existing water mains with larger pipes, capable of carrying sufficient water to meet the increasing loads."

Sarno about its dispute with the water commissioners. The water commissioners refused to permit the connection.

On June 3, 1969, Byors commenced the present suit. On or about June 3, 1969, Beacon Architectural Associates, the architect hired by the housing authority in connection with the construction of the housing project, in accordance with contractual provisions, notified Sarno of its decision that Byors was required to pay the demand charge under the subcontract with Sarno.[2]  Byors was notified of the architect's decision on June 8, 1969.  Although the contract provides for an appeal from the architect's decision, Byors has not appealed.

On or about June 24, 1969, the housing authority paid the demand charge, informing Sarno at the same time of its intention to withhold the amount of the charge, $10,950, from its payment to Sarno.  Sarno, likewise, has withheld the amount of the charge from payments to Byors under the subcontract.

### VALIDITY OF THE DEMAND CHARGE.

The first issue to be determined is whether it was within the power and authority of the water commissioners to demand a charge of $10,950 before permitting a connection between the town water main and the housing project.  We hold that the water commissioners had such authority.  The relevant legislative provisions are c. 192 of St. 1882, G. L. c. 40, § 42G, and G. L. c. 41, § 69B.  Each one has been accepted by the town of Northborough, acting through its town meeting.

Statute 1882, c. 192, provides that the water commissioners may fix and collect rents for the use of water.[3]  Gen-

---

[2] The statement of agreed facts states the following: "The general contract provides in its general conditions that all disputes arising under this contract shall be decided by the Architect subject to the right of appeal to the Deputy Commissioner for the Division of Housing, whose decision shall be final."

[3] Statute 1882, c. 192, provides in part as follows: "SECTION 1. The town of Northborough may supply itself and its inhabitants with water . . . and may fix and collect rents for the use of such water. . . . SECTION 7. . . . All the authority granted to the said town by this act and not otherwise specifically provided for shall be vested in said board of water commissioners . . . ."

eral Laws c. 40, § 42G, states in part that a town "may provide that an owner of land which receives benefit from the laying of water pipes in public and private ways upon which his land abuts or which by more remote means receives benefit through the supply of water to his land or buildings shall pay a proportionate part of the cost not already assessed of extending such water supply to his land." General Laws c. 41, § 69B, grants to the water commissioners the authority to "regulate the use of the water and fix and collect just and equitable prices and rates for the use thereof," and to "prescribe the time and manner of payment of such prices and rates." These legislative provisions grant the water commissioners considerable discretion in determining the methods of fixing prices or rates related to the use of water. Although the demand charge in this case is not measured in terms of the amount of water received, it is still a permissible method of charging for water use, within the broad authority granted to the water commissioners. All water charges need not be based on the amount of water used in each instance and on nothing else. *Souther* v. *Gloucester*, 187 Mass. 552. As stated in *Ladd* v. *Boston*, 170 Mass. 332, 335-336: "Considerable discretion in determining the methods of fixing rates is necessarily given by the statute to the water commissioner. Money must be obtained from water takers to reimburse the city wholly or in part for the expense of furnishing water. An equitable determination of the price to be paid for supplying water does not look alone to the quantity used by each water taker. The nature of the use and the benefit obtained from it, the number of persons who want it for such a use, and the effect of a certain method of determining prices upon the revenues to be obtained by the city, and upon the interests of property holders, are all to be considered." Or as this court stated in *Rounds* v. *Board of Water & Sewer Commrs. of Wilmington*, 347 Mass. 40, 44: "A municipality engaged in furnishing water service (subject to whatever statutory regulation there may be) is permitted to exercise a reasonable and fair discretion in

determining whether and upon what terms to make extensions of its lines."

Byors contends further that the demand charge is unreasonable and discriminatory. The burden of proof here is on Byors. *Souther* v. *Gloucester*, 187 Mass. 552, 556. Paragraph 24 of the statement of agreed facts provides the only evidence on this point. It clearly delineates the reasons for the demand charge and for the expenditure of large sums in order that adequate service might be provided to the units already built and those to be built.[4] We feel, therefore, that Byors has not sustained its burden of proof. See *Souther* v. *Gloucester, supra,* at 556; *Brand* v. *Water Commrs. of Billerica,* 242 Mass. 223, 228.

## LIABILITY FOR THE DEMAND CHARGE UNDER THE CONTRACT.

The second issue raised requires a determination as to who is responsible for payment of the demand charge. At the trial both Byors and Sarno contended that the demand charge was an obligation of the housing authority. The architect and the trial judge, however, interpreted the contracts to require payment by Byors. The court below indicated in its decision that it found this determination "troublesome." [5]

We believe that the trial judge erred in his conclusion that the terms of the contract documents require payment of the demand charge by Byors. In upholding the validity

---

[4] See fn. 1, *supra.*

[5] The trial judge, in his decision, stated: "I have characterized the question for determination here as 'troublesome' because it might well have been expected that a charge of the magnitude of the demand charge with which we are concerned here would be borne by the Housing Authority, which is in the position of an owner in terms of normal building contracts. Neither the plaintiff nor the defendant Sarno contemplated that this charge should be borne by either of them. In the event they had, the bids which were submitted could reasonably have been expected to include an item of such magnitude. In fact neither of the bids contained any provision for such a charge. It is clear from the record that what the contractors, both the general contractor Sarno, and the subcontractor, the plaintiff expected to pay were what may be fairly characterized as nominal charges for permits from the municipal authorities."

of the demand charge, this court and the court below neces-
sarily accepted the contention that the "demand charge"
is a charge for use of water. A property owner, in the ab-
sence of a binding agreement, is obligated to pay for water
service and for charges connected therewith. We believe
that the contract documents in this case do not place this
responsibility on a party other than the owner.

Both the architect and the trial judge cited the contract
provision requiring Byors to "[o]btain all necessary permits
and licenses and pay all connected fees." In his decision
the trial judge emphasized the word "connected" and
concluded that Byors is required "to pay all legitimate
charges of the Board of Northborough Water Commis-
sioners for connecting the project water service to the town
main." The words "permits and licenses" and "connected
fees" in their natural interpretation within the provisions
of the general contract and subcontract refer only to those
permits and licenses that the contractor or subcontractor
is required to obtain before beginning the work under his
contract. Byors did obtain ten permits to do the plumbing
work. This requirement insures that the work will be done
in accordance with the rules, regulations and ordinances
of the municipality. Conversely, the words cannot be
construed as requiring the subcontractor to pay the "de-
mand charge" which is a prerequisite to the *sale* of water
by the water commissioners to the housing authority. In
other words, we read the clause in question to require that
Byors pay only the fees connected with the work and ma-
terials it is obligated to furnish under the contract. The
demand charge of $10,950 is not such a "fee."

The architect and the trial judge also relied upon two
other contract provisions. The first of these requires that
the plumbing subcontractor "Install all work in strict
accordance with all applicable codes and ordinances of the
Town of Northborough and the Commonwealth of Massa-
chusetts . . . including the rules and regulations of the
Town of Northborough Water Department . . . ." This
general provision deals with the manner of physical instal-

lation and the type of materials used; it makes no reference to payment of any charge including the demand charge. The provision that "All water main and water services shown on drawing C-3 shall be the responsibility of the plumbing Sub-contractor including street connection" is also general and makes no reference to the demand charge. This work was included in the "outside water" item referred to in exhibit F.[6]

In addition the architect in his decision relied upon two other provisions in the contract documents. Section 8A, subdivision 1, in the contract, provides that Byors is to "[h]andle the Owner's application to the Northborough Water Dept. for new 6″ service from existing 8″ main in Summer St. to hydrant location on site, and to the various buildings as shown on drawing C-3." This provision must be examined with the application form itself which requires detailed information from the owner as to the types of buildings to be serviced, description of water use to be made, and the type of heat, air conditioning and sprinklers. The application form states that a demand charge of $150 a unit must be paid before any action is taken on the application. It requires the signature of the owner "as per deed" and over the space reserved for owner's signature appear the words, "I hereby make application for water service; and I agree to abide by the rules and regulations of the Water Department." Rule 1 of the rules and regulations of the Northborough water department requires that the application state "the various uses to which the water is to be applied, and [that the application is to be] signed only by the *owner of the premises, or his authorized agent*" (emphasis

---

[6] "The following is . . . [the] contract breakdown for the Plumbing at the . . . project:

| | |
|---|---:|
| Outside Water | $ 4600.00 |
| Roughing | 43979.00 |
| Water Piping | 25000.00 |
| Fixtures and Finish | 20000.00 |
| Insulation | 5421.00 |
| Total Contract Price | $99000.00" |

supplied in the rule). The natural and logical construction of these documents is that the application form is to be executed by the housing authority as owner and that the housing authority alone assumes the responsibilities created thereunder. Rule 1 of the rules and regulations and § 8A, subdivision 1, in the contract required merely a routine handling by Byors of the application for water service. The obvious reason for these provisions is that the plumbing subcontractor would be in the best position to determine when the plumbing work and the installation of outside water pipes had progressed to the point where the housing authority project could be tied into the eight inch water main in the street. In "handling" the application Byors acted only as an agent for the housing authority in accordance with the "rules and regulations" and did not thereby assume personal obligation to pay the demand charge. See *Porshin* v. *Snider,* 349 Mass. 653, 655.

Finally, the architect referred to "[i]nstructions to bidders" which required, "General Bidders and Plumbing Sub-Bidders are required to obtain, prior to the submission of bids, the rules and regulations of the Town of Northborough Water Department . . . ." There is nothing in the rules and regulations to put Byors on notice that he was to pay a demand charge of $10,950 for water service to the housing authority. On the contrary, a reasonable interpretation of the rules and regulations, together with the application form, leads to an opposite conclusion, namely, that the obligation for paying the demand charge rested solely on the housing authority. In the circumstances here presented we rule that nothing in the contract documents requires that either Byors or Sarno pay the demand charge and that they obligated themselves "to do only precisely the work on which . . . [they] had bid." *Fred C. McLean Heating Supplies, Inc.* v. *Jefferson Constr. Co.* 339 Mass. 356, 362.

The general contract provides that "all disputes arising under this contract shall be decided by the Architect subject to the right of appeal to the Deputy Commissioner for the

Division of Housing, whose decision shall be final." [7]  Pursuant to this provision, and for reasons stated, the architect decided that Byors was required to pay the demand charge.

Provisions giving an architect the power to decide disputes arising under a contract are frequently found in construction contracts. *G. L. Rugo & Sons, Inc.* v. *Lexington,* 338 Mass. 746, 751, and cases cited. *Fred C. McLean Heating Supplies, Inc.* v. *Jefferson Constr. Co., supra,* at 363. Corbin, Contracts, §§ 648–652. "It is well established that, where a building contract makes the architect an arbitrator between the parties to determine practical questions of construction that arise under the plans and specifications in the execution of the work, his decision upon these matters is binding." *Handy* v. *Bliss,* 204 Mass. 513, 520. See *Norcross* v. *Wyman,* 187 Mass. 25; *Marsch* v. *Southern New England R.R.* 230 Mass. 483. Also, "[i]t is true that the decision of one authorized to determine questions relating to the carrying out of a building or construction contract, whose decision the parties have agreed shall be final and binding upon them, must stand except in cases of fraud, or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment." *Morgan* v. *Burlington,* 316 Mass. 413, 419–420, and cases cited. The issues over which the architect is given power of decision must, however, be determined by the reasonable interpretation of the contract provision creating such power. See Corbin, Contracts, § 652. The provision itself does not stand alone. "It must be construed with the other provisions of the contract, giving each its appropriate force and effect and construing all the provisions as harmonious and consistent portions of a single contract which the parties adopted as the means of accomplishing their purpose." *Morgan* v. *Burlington, supra,* at 418. See *Bray* v. *Hickman,* 263 Mass. 409; *Radio Corp. of Am.* v. *Raytheon Mfg. Co.* 300 Mass. 113. The decision of the architect is not conclusive where he exceeds the authority conferred upon him and

---

[7] See fn. 2, *supra.*

attempts to pass on matters not contemplated by the contract. Thus in *Morgan* v. *Burlington, supra,* the contract gave the architect broad powers to interpret the plans, specifications and contract; nevertheless, the court held that the architect had exceeded his authority in taking work from one party and awarding it on bids to another person. See *Derby Desk Co.* v. *Conners Bros. Constr. Co.* 204 Mass. 461. In the instant case, "[a]lthough . . . [the architect's] power was broad, it was not without rational limits." *Morgan* v. *Burlington, supra,* at 420. There is nothing in the contract that imposed the responsibility of payment of the demand charge (not covered in the contract) upon Byors. "The power to interpret the contract did not give him the power to make a new contract for the parties . . . . He could translate the contract and ascertain its meaning but he could not add to or detract from the text." *Id.* at 420. The architect was acting beyond his authority in deciding that Byors was responsible for payment of the demand charge. Therefore, his decision must be regarded as a nullity. See *Morgan* v. *Murdough,* 216 Mass. 502, 505; *J. F. Fitzgerald Constr. Co.* v. *Southbridge Water Supply Co.* 304 Mass. 130, 134. See generally, 54 A. L. R. 1255.

The final decree is reversed; a new decree is to be entered that the demand charge is valid and that the housing authority is liable for it.

*So ordered.*